# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GHOST PROPERTIES, LLC, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | CIVIL ACTION NO. 3:16-CV-1683 <br><br> Choose an item. <br> (MEHALCHICK, M.J.) |

## MEMORANDUM

**I.  BACKGROUND AND PROCEDURAL HISTORY**

Ghost Properties, LLC ("Ghost Properties") initiated this complaint against Borough of Starrucca, the Natural Resources Conservation Service of the United States Department of Agriculture ("NRCS") and various John Does in the Court of Common Pleas of Wayne County, Pennsylvania on or about April 4, 2013. (Doc. 1, at 2). On August 12, 2016, Defendant NRCS removed the case to the United States District Court for the Middle District of Pennsylvania, under the provisions of Title 28 U.S.C. § 1442, (Doc. 1, at 1), and the matter was referred to the undersigned for proceedings. (Doc. 6). On October 27, 2016, Ghost Properties filed an Amended Complaint (the "Complaint") against all Defendants, which now stands as the operative complaint in the matter. (Doc. 9). In the Complaint, Ghost Properties alleges Defendants negligently planned, designed, and constructed a wall which was purposed to reduce the hazards of flooding from a nearby river. (Doc. 9). On October 21, 2019, the Court was informed that Plaintiff and Defendant Borough of Starrucca had reached a settlement, (Doc. 52), and Borough of Starrucca was subsequently terminated from the matter.

Ghost Properties specifically alleges that it owns property in the Borough of Starrucca adjacent to land and a wall (the "subject wall") owned by the Borough of Starrucca along the river bank of Shadigee Creek. (Doc. 9, at ¶ 5). Ghost Properties submits that "NRCS provided design work, consultation, analysis, plans, design, oversight, and inspection of the construction of the subject wall." (Doc. 9, at ¶ 9). This included review and approval of all design and plans for the subject wall's construction. (Doc. 9, at ¶ 7). The construction of the subject wall itself, however, was performed by Rutledge Excavating, Inc. ("Rutledge"), the services of which were retained by the Borough of Starrucca. (Doc. 9, at ¶ 11).

On June 27, 2013, approximately six months after Rutledge was retained to construct the subject wall, the subject wall allegedly "gave way," directing and allowing water to flow in, on, around, over, and about Plaintiff's property. (Doc. 9, at ¶ 13). Ghost Properties alleges that NRCS negligently caused the damages to the property (Doc. 9, at ¶ 23) by improperly designing and constructing the subject wall; improperly selecting the location and placement of the subject wall; improperly designing, constructing, clearing, and grading of the subject wall; improperly designing and constructing storm water management; defectively designing and constructing the subject wall; improperly taking mitigation and preventative measures; improperly monitoring the site; and improperly analyzing the site prior to construction of the subject wall. (Doc. 9, at ¶ 22). Due to NRCS's alleged negligence, Ghost Properties alleges its property was damaged and the cost of remedying that damage was approximately $45,299.00. (Doc. 9, at ¶ 25). Additionally, Ghost Properties alleges it lost rental income in the amount of $26,000.00. (Doc. 9, at ¶ 26). Ghost Properties requests $71,299.00 in relief. (Doc. 9, at 6).

Pending before the Court is a Motion to Dismiss filed by NRCS on May 2, 2019. (Doc. 43). Specifically, NRCS moves to dismiss the complaint on the grounds that this Court lacks

subject matter jurisdiction over Plaintiff's claim because (1) the United States, rather than NRCS, is the proper defendants; (2) the discretionary function of the FTCA divests this Court of subject matter jurisdiction; and (3) Plaintiff failed to comply with the FTCA's exhaustion requirements. Plaintiff concedes that NRCS should be substituted with the United States, and therefore that portion of Defendant's motion is granted, and the United States is substituted for NRCS.

The remainder of Defendant's motion has been fully briefed, (Doc. 46, Doc. 47, Doc. 51), and is now ripe for review.

## II. STANDARD OF REVIEW

Rule 12(b)(1) of the Federal Rules of Civil Procedure authorizes a defendant to move to dismiss for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). A motion to dismiss under Rule 12(b)(1) may be treated as either a facial or factual challenge to the court's subject matter jurisdiction. *Gould Electronics Inc. v. United States*, 220 F. 3d 169, 176 (3d Cir. 2000). In a facial challenge under Rule 12(b)(1), a defendant argues that "the complaint, on its face, does not allege sufficient grounds to establish subject matter jurisdiction." *D.G. v. Somerset Hills School Dist.*, 559 F. Supp. 2d 484, 491 (D.N.J. 2008). In response to the defense's facial challenge of subject-matter jurisdiction, the Court "must consider the allegations of the complaint as true." *Mortensen v. First Fed. Savings & Loan Association*, 549 F.2d 884, 891 (3d Cir. 1977). In a factual challenge under Rule 12(b)(1), "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Mortensen*, 549 F.2d at 891. "Evidence outside the pleadings [may be examined] to determine ... jurisdiction." *Gould Electronics Inc.*, 220 F. 3d at 178. "When a motion under Rule 12 is based on more than one ground, the court should consider the 12(b)(1) challenge first because if it

must dismiss the complaint for lack of subject matter jurisdiction, all other defenses and objections become moot." *In re Corestates Trust Fee Litigation*, 837 F. Supp. 104, 105 (E.D. Pa. 1993), *aff'd* 39 F.3d 61 (3d Cir. 1994). "Rule 12(b)(1) motions may be filed at any time and repeatedly, if the movants assert new arguments warranting [the court's] attention." *Fahnsestock v. Reeder*, 223 F. Supp. 2d 618, 621 (E.D. Pa. 2002).

In claiming sovereign immunity and failure to exhaust administrative remedies, NRCS now brings a factual challenge to this Court's subject matter jurisdiction. Therefore, the Court is free to weigh the evidence and consider evidence outside the pleadings. *See Gould Electronics Inc.*, 220 F.3d at 178; *Mortensen*, 549 F.2d at 891. It is within this framework that the Court will review Ghost Properties' amended complaint and NRCS's motion to dismiss.

### III. DISCUSSION

#### A. THE FEDERAL TORT CLAIMS ACT

NRCS submits that it is entitled to sovereign immunity to Plaintiff's suit under the Federal Tort Claims Act. (Doc. 46, at 12). While the United States generally enjoys sovereign immunity from civil law tort claims, the Federal Tort Claims Act (the "FTCA") partially waives that right. 28 U.S.C. §§ 2671–80. The FTCA, enacted by Congress in 1946, states that the United States "shall be liable … in the same manner and to the same extent as a private individual under like circumstances," subject to several exceptions. 28 U.S.C. § 2674. NRCS submits that it is entitled to sovereign immunity under the "discretionary function exception" of the FTCA. (Doc. 46, at 12-18). Under this exception, sovereign immunity continues to apply to

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance

or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

If Plaintiff's claim is based upon NRCS's exercise or performance or the failure to exercise or perform a discretionary function or duty, then the Court does not have jurisdiction to hear this case. It does not matter if that discretion was abused. *See* 28 U.S.C. § 2680(a).

B.  THE DISCRETIONARY FUNCTION EXCEPTION

The United States Supreme Court has prescribed a two-part test to determine whether government conduct falls under the discretionary function exception. To qualify as 'discretionary,' the first prong requires the act to "involv[e] an element of judgment or choice." *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (internal quotation omitted). The act may be performed by a cabinet secretary, or it may be performed by a park ranger; as long as it involves the rightful option to make a decision,[1] then it satisfies this prong of the test. *Gaubert*, 499 U.S. at 322.

If the first prong of the test is satisfied, then the second requirement to qualify as 'discretionary' is that the "judgment is of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322. The discretionary function exception was designed to shield "judicial 'second-guessing' … of decisions grounded in social, economic, and political policy. *United States v. S.A. Empresa de Viacao Aerea Rio Grandese (Varig Airlines),*

---

[1] If a course of action is prescribed by a statute, regulation, or policy then there is "no rightful option but to adhere to the directive." *Gaubert*, 499 U.S. at 322.

467 U.S. 797, 814 (1984). A public policy consideration is the essential component of an action deserving of discretionary function protection. *Gaubert*, 499 U.S. at 323. Conversely, "such common-law torts as an automobile collision caused by the negligence of an employee of the administering agency" are matters for which the government may be liable under the FTCA. *Dalehite v. United States*, 346 U.S. 15, 34 (1953) (partially abrogated on other grounds).

A "crucial" first step is "determin[ing] exactly what conduct is at issue." *Cestonaro v. United States*, 211 F.3d 749, 753 (3d Cir. 2000) (internal quotation omitted). After the conduct is identified, the Court must determine whether the conduct is "susceptible to policy analysis." *Gaubert*, 499 U.S. at 325.

### 1. The conduct of NRCS involved an element of choice.

Ghost Properties claims that NRCS's negligent acts and omissions caused it to suffer damages to its property and suffer loss of rental income. (Doc. 9). The alleged conduct includes:

(i) improper design and construction of storm water management;

(ii) improper analysis prior to construction of the subject wall;

(iii) improper monitoring of the site;

(iv) improper mitigation and preventative measures to reduce the threat of water flowing in, on and around Plaintiff's property;

(v) improper selection of the locations of the subject wall;

(vi) improper placement of the subject wall;

(vii) improper design and construction of the subject wall;

(viii) defective design and construction of the subject wall; and

(ix) improper design and construction, clearing, and grading of the subject wall.

(Doc. 9, at ¶¶ 22-23).

To qualify as discretionary conduct, the acts must "involv[e] an element of judgment or choice." *Gaubert*, 499 U.S. at 322. NRCS submits that the program under which it built the subject wall, the Emergency Watershed Protection ("EWP") program, is authorized under the Agriculture Credit Act of 1978 as well as 33 U.S.C. § 701b-1. (Doc. 46, at 15). NRCS quotes Title 33 as stating,

> The Secretary of Agriculture is authorized *in his discretion* to undertake such emergency measures for run-off retardation and soil-erosion prevention as may be needed to safeguard lives and property from floods and the products of erosion on any watershed whenever fire or any other natural element or force has caused a sudden impairment of that watershed.

(Doc. 46, at 15-16) (emphasis added by NRCS) (quoting 33 U.S.C. § 701b-1).

Further, NRCS submits that the Secretary of Agriculture has discretion through NRCS "to exercise discretion to take emergency measures in accordance with the EWP Program to address floods, water flow retardation, and run-off retardation and soil-erosion prevention." (Doc. 46, at 16). NRCS also submits that because there is "no federal statute, regulation, or policy specifically prescribing how NRCS shall design a particular project to handle [these] measures," its decision on how to design and implement these measures are "exercises of judgment and choice." (Doc. 46, at 16).

In turn, Ghost Properties argues that NRCS did not have discretion because the Commonwealth of Pennsylvania, through the Pennsylvania Department of Environmental Protection's 'General Permit 4' prescribed how NRCS was to design and implement its measures. (Doc. 47, at 2-3, 10). This prescription, Ghost Properties argues, mandated that "the activity must be designed to maintain pre-construction downstream flow conditions (i.e.

location, capacity, and flow rate). Furthermore, the activity <u>must</u> not permanently restrict or impede the passage of normal or expected high flows…" (Doc. 47, at 10) (emphases added by Ghost Properties) (citing (Doc. 46-1, at 87)).

Ghost Properties further submits that NRCS could not have been acting pursuant to the EWP because a "watershed emergency" is defined by the program as "a natural occurrence that creates a sudden impairment of a watershed and creates an imminent threat to life or property." (Doc. 47, at 10) (citing 7 C.F.R. 624(h)). NRCS acknowledged that the subject wall had "sat damaged, broken and in disrepair for many years," therefore there was no imminent threat to life or property, and no emergency. (Doc. 47, at 10). Ghost Properties asserts, therefore, that NRCS's argument that it had explicit authority to exercise discretion "to take emergency measures" should fail. (Doc. 47, at 10-11); (Doc. 46, at 15-16).

The complaint and documents considered by this Court fail to establish that NRCS was not permitted to exercise an element of judgment or choice. *See Gaubert*, 499 U.S. at 322. A review of the application documents and agreements shows that NRCS was acting most directly under the EWP. (Doc. 46-1, at 79, 80, 92, 96, 97). The EWP states that it will

> only provide assistance for measures that: (1) Provide protection from additional flooding or soil erosion; and, (2) Reduce threats to life or property from a watershed impairment, including sediment and debris removal in floodplains and uplands; and (3) Restore the hydraulic capacity to the natural environment to the maximum extent practical; and (4) are economically and environmentally defensible and technically sound."

7 C.F.R. 624.6(c).

Further, the EWP states that it is implemented for "planning emergency recovery practices." 7 C.F.R. 624.6(e). The language used by the EWP – assistance for measures that 'provide protection from additional flooding or soil erosion' and 'planning' emergency recovery

practices – is language that does not signal permissive action only in the face of an immediate emergency. *See* 7 C.F.R. 624. Rather, the language indicates that NRCS is to take proactive measures, *prior* to any *further* emergency, to mitigate the effects of a watershed emergency. Though the language from Title 33 which NRCS submits gives it explicit discretion in carrying out its operations, (Doc. 46, at 15-16), is promulgated at such macro a level as to have limited application to the case at hand – it broadly confers upon the Secretary of Agriculture discretion to undertake emergency measures for run-off retardation and soil-erosion prevention allowing for the EWP to be created – NRCS was nevertheless authorized to undertake and perform the work on the subject wall. *See* 7 C.F.R. 624.6.

More applicable to NRCS's conduct with regards to the subject wall is whether it enjoyed discretion in the face of Pennsylvania Department of Environmental Protection's 'General Permit 4.' (Doc. 47, at 2-3, 10). If a course of action is prescribed by a statute, regulation, or policy, then there is "no rightful option but to adhere to the directive." *Gaubert,* 499 U.S. at 322. Ghost Properties submits that the permit mandates how NRCS was to design and implement its measures, as it states, in pertinent part, that the activity "must be designed to maintain pre-construction downstream flow conditions…" and "must not permanently restrict or impede the passage of normal or expected high flows…" (Doc. 46-1, at 87; Doc. 47, at 10).

However, rather than mandating a specific design or location or construction method, the permit prescribes an end-goal directive. *See* (Doc. 46-1, at 87). It states that when the activity is finished, "pre-construction downstream flow conditions" shall be maintained and the passage of normal or expected high flows shall not be permanently restricted or impeded. (Doc. 46-1, at 87). The permit does not prescribe how a wall is to be located, designed, or

constructed, nor how a site is to be monitored, nor how storm water management is to be conducted. (Doc. 46-1, at 87). It merely directs that when all is finished, flow conditions shall not be restricted or impeded but rather maintained. (Doc. 46-1, at 87). Furthermore, the relevant section of the permit begins with the words, "To the maximum extent practicable…" signaling that the prescription is not absolute but rather leaves room for limited discretion. (Doc. 46-1, at 87). The law states that, "if a *course of action* is prescribed by a statute, regulation, or policy then there is "no rightful option but to adhere to the directive." *Gaubert*, 499 U.S. at 322 (emphasis added). Here, the course of action was the placement, design, and construction of the subject wall, and this was the conduct which resulted in the flow conditions prescribed by the permit. *See* (Doc. 46-1, at 87).

Ghost Properties also cites the National Environmental Protection Act ("NEPA") as prescribing a course of action that takes away any discretion. Specifically, Ghost Properties asserts that the NEPA required NRCS to produce an Environmental Impact Statement ("EIS") – "required for stream channel realignment or work to modify channel capacity" – and that this was not done. (Doc. 47, at 11) (citing 7 C.F.R. 650.7). In making this argument, however, Ghost Properties does not include the conditional portion of the quoted NEPA requirement: the EIS is only required when such channel realignment or channel capacity modifications are made "by deepening or widening where significant aquatic or wildlife habitat exists." 7 C.F.R. 650.7. Ghost Properties fails to show that NRCS deepened or

widened nor that significant aquatic or wildlife habitat existed in this creek, therefore this argument lacks merit.[2]

Additionally, Ghost Properties relies on the NRCS Conservation Practice Standard to show that a course of action was prescribed and that NRCS was not afforded discretion. (Doc. 47, at 12-13). The required actions which Ghost Properties alleges were not satisfied include designing protective treatments compatible with the physical makeup of the bank or shoreline, stabilizing end sections of the treatment areas, assessing the fluvial geomorphology of the channel and the effects a proposed alignment would have on it, designing the project to sustain for flow levels above those prior to the installation, and plans and specifications unique to the specific field site and in accordance with local agreements, opinions, or permits. (Doc. 47, at 12-13). In response, NRCS demonstrates that its 'Design Package' accounted for and analyzed the physical makeup of the channel, bank, and shoreline, (Doc. 51-2, at 30-50), and the treatment NRCS used (the subject wall) was intended to be compatible with such physical makeup. (Doc. 51-2, at 35). Further, the Design Package shows that NRCS did perform a hydraulic study to determine compatibility. (Doc. 51-2, at 34). NRCS's project did not involve realigning the channel, which necessitates the fluvial geomorphology assessment Ghost Properties identifies, (Doc. 47, at 12), therefore such assessment was not required. (Doc. 51-2, at 4). It appears clear from the Design Package, (Doc. 51-2, at 30-50), that the plans and

---

[2] Similarly, though 7 C.F.R. 650.12, which Ghost Properties alleges was violated, does not prescribe a course of conduct regarding the decisions which should be made vis-à-vis the location, design, or construction of the subject wall, NRCS nevertheless produced documents evidencing compliance. (46-1, at 163-166); (46-1, at 167-169); (Doc. 51-2, at 7-28).

specification were unique to the specific field site and there is nothing to indicate they were violating any local agreement, opinion, or permit. Finally, Ghost Properties fails to provide evidence showing the effect of NRCS's protective treatment was to increase flow levels above those that existed prior to the installation, and there is no evidence that NRCS located, designed, or constructed the project with a purpose of not maintaining flow capacity in violation of the NRCS Conservation Practice Standard. (Doc. 47, at 13) (citing Doc. 47-2, at 1). To the extent that a course of conduct was prescribed, the evidence shows NRCS abided by the prescription. Not all course of conduct was prescribed, however, and so NRCS was in many ways responsible for utilizing its discretion.

NRCS testified that the location of the wall, the design of wall, and the construction of the wall were dependent on multiple factors and considerations. Included in these factors were the physical characteristics of the creek, the sponsor's (Borough of Starrucca) preferences, and projected costs. (Doc. 46-1, at 23) (acknowledging that cost effectiveness affected the design of the project); (Doc. 46-1, at 35) (explaining that a rudimentary evaluation of the velocity of the channel was done prior to performing repairs); (Doc. 46-1, at 37, 56) (explaining that NRCS changed the alignment and location of the wall to "acknowledge" and accommodate the sponsor's observation of a restriction in the channel and to "improve upon that as best we could"); (Doc. 46-1, at 42-43) (explaining that 'pinning' the blocks is a decision made according to necessity and likelihood of damage). NRCS had to base its decisions as to location, design, and construction on multiple specific factors unique to this specific situation. Discretionary choices were made at all levels of carrying out the project.

Every action alleged by Ghost Properties to be defective or improper (Doc. 9, at 5-6) involved an element of judgment or choice on the part of NRCS and its engineers. *See Gaubert,*

499 U.S. at 322 (explaining that the requirement of judgment or choice is not satisfied only when an employee has *no* rightful option but to adhere to directives) (emphasis added). Therefore, the first requirement of the discretionary conduct exception is satisfied. *See Gaubert*, 499 U.S. at 322.

### 2. The judgment of NRCS was the type meant to be shielded by the discretionary function exception.

The second prong of the discretionary function exception requires the judgment or choice to be included in the types of acts the exception was designed to shield. *Gaubert*, 499 U.S. at 322. Essentially, the judgment or choice must involve a consideration of public policy. *Gaubert*, 499 U.S. at 323. It does not matter whether the act is carried out by top-level officials or by "subordinates … carrying out the operations of government in accordance with official directions." *Dalehite*, 346 U.S. at 35-36. To meet this requirement, the challenged conduct must be "based on the purposes that the regulatory regime seeks to accomplish." *Gaubert*, 499 U.S. at 325 n. 7.

NRCS asserts that its judgments and choices regarding the subject wall were "guided by safeguarding lives and property from floods." (Doc. 51, at 9). This, NRCS argues, represents public policy consideration included in the types of acts the discretionary exception was designed to shield. (Doc. 51, at 3). Ghost Properties submits that the decisions regarding the subject wall were not part of a flood control project, therefore were not part of a policy decision. (Doc. 47, at 10). All exhibits and documents which address this project indicate that it was part of a flood control project. (Doc. 46-1, at 79-197). The subject wall was located, designed, and constructed as part of the Emergency Watershed Protection Project, (Doc. 46-1, at 79), and the project description describes 'major repairs' which are needed along the

- 13 -

stream bank, and that a protective wall would be installed from the stream bed to the top of the bank. (Doc. 46-1, at 82). If the location, design, and construction of the subject wall involved consideration of public policy, then NRCS shall be immune from suit. *See Gaubert*, 499 U.S. at 323.

In *Cestonaro v. United States*, 211 F.3d 749 (3d Cir. 2000), the Third Circuit held that the National Park Service's ("NPS") decision to not provide adequate lighting at one of its parking lots did not involve consideration of public policy so as to be protected by the discretionary function exception. *Cestonaro*, 211 F.3d at 757. In so holding, the court explained that the NPS failed "to show how providing some lighting, but not more, is grounded in the policy objectives with respect to the management of the National Historic Site." *Cestonaro*, 211 F.3d at 757. The Court also looked to the policy objectives of "preserving the historical integrity of the structures and their environs," and to discourage the practice of parking in that area. *Cestonaro*, 211 F.3d at 757-58. Other indicia of parking still existed, the Court observed, which undermined NPS's 'parking discouragement' argument. *Cestonaro*, 211 F.3d, at 758. Additionally, the amount of lighting in the parking lot and the failure to warn the public of known dangers are not decisions so involved with the policy of historical preservation so as to allow for immunity. *Cestonaro*, 211 F.3d at 757-58. In short, the court could not "find a rational nexus between the National Park Service's lighting or warning decisions (or non-decisions) and social, economic and political concerns. Nor will plaintiff's claim seriously impede the National Park Service's proper functions or operations." *Cestonaro*, 211 F.3d at 759.

Conversely, in *Mitchell v. United States*, 225 F.3d 361 (3d Cir. 2000), the plaintiff was driving through the Delaware Water Gap National Recreation Area on a road maintained by

the NPS. *Mitchell*, 225 F.3d at 363. The NPS had identified culvert head-walls on this road which constituted safety hazards and had prioritized repairs according to urgency. *Mitchell*, 225 F.3d at 363. The plaintiff, in the process of driving, left the road, entered a drainage ditch, and struck a concrete head-wall of a culvert sustaining serious injuries. *Mitchell*, 225 F.3d at 363. The court determined that the NPS's prioritization of road repairs and redesigns was a policy choice that it "should not second-guess." *Mitchell*, 225 F.3d at 364. In so deciding, the court explained that the NPS was "required to balance its mission of preserving the parklands against the severity of design flaws and the different levels of deterioration of the road…" *Mitchell*, 225 F.3d at 364. The NPS had to consider the location of this culvert, the danger it posed, and the costs associated with it and the rest of the repairs that had to be made. *Mitchell*, 225 F.3d at 366. The decisions were not "mundane, administrative, garden-variety, housekeeping," but rather involved consideration of the road's purpose and how repairs should be made in light of how the road should be used. *Mitchell*, 225 F.3d at 365-66.

The Third Circuit, in *Williams v. United States*, 321 F. App'x 129 (3d Cir. 2009), addressed a situation involving very similar circumstances to those at hand. In *Williams,* the plaintiff built her home near a Delaware River depository and subsequently experienced ongoing flooding in her basement. *Williams,* 321 F. App'x at 131. In response, the U.S. Army Corps of Engineers performed work on the drainage ditch behind her home, yet the flooding problem persisted. *Williams,* 321 F. App'x at 131. The plaintiff then sued on claims of negligent design and negligent maintenance, but the court determined that "Congress conferred discretion on the Corps of Engineers to maintain navigable waterways, and specifically the discretion to plan for and conduct dredging operations." *Williams,* 321 F.

App'x at 133. With this statutory grant of discretion, a presumption arose that the defendant's actions were grounded in policy. *Williams*, 321 F. App'x at 133.

With regards to the allegations put forth by Ghost Properties, all decisions and choices made by NRCS involved consideration of public policy except for those involving the actual construction, clearing, and grading of the subject wall. (Doc. 9, at 5-6). The objective of the Emergency Watershed Protection Program "is to assist sponsors, landowners, and operators in implementing emergency recovery measures for runoff retardation and erosion prevention to relieve imminent hazards to life and property created by a natural disaster that causes a sudden impairment of a watershed." 7 C.F.R. § 624.2. NRCS's course of action in designing, maintaining, and monitoring the subject wall and the site, including conducting analysis prior to constructing the subject wall and determining where the subject wall should be located and placed, involved consideration of how to slow runoff and prevent erosion while saving money so as to sustain its mission. *See Williams*, 321 F. App'x at 133; *Mitchell*, 225 F.3d at 366. As such, NRCS is immune from suit for any cause of action arising from these acts under the discretionary function exception to the FTCA. 28 U.S.C. § 2680(a).

## IV. CONCLUSION

For the reasons set forth in this Memorandum Opinion, NRCS's motion to dismiss (Doc. 43) is **GRANTED**.[3] Further, because "an action cannot be maintained solely against

---

[3] Having determined that the discretionary function exception bars any claim against NRCS, the Court will not fully address the exhaustion argument. However, the Court notes that Ghost Properties' claim accrued on June 27, 2013 (Doc. 9, at 4), but despite repeated prompting and reminders from NRCS, Ghost Properties did not present a claim in accordance
*(footnote continued on next page)*

Doe defendants," the Complaint shall be **DISMISSED** with respect to the remaining John Doe Defendants. *See Hindes v. F.D.I.C.*, 137 F.3d 148, 155 (3d Cir. 1998). Finally, the Clerk of Court will be directed to **CLOSE** this case.

    An appropriate Order shall follow.

Dated: February 28, 2020                        *s/ Karoline Mehalchick*
                                                             **KAROLINE MEHALCHICK**
                                                             **United States Magistrate Judge**

---

with what the law requires until June 29, 2015, more than two years after the accrual date. (Doc. 46-1, at 187-190). The presentment requirements dictated by the FTCA are jurisdictional and cannot be waived. *Bialowas v. United States*, 443 F.2d 1047, 1049 (3d Cir. 1971). As such, it appears that Ghost Properties did fail to comport with the FTCA exhaustion requirements.